IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 03-555 |
| | : | |
| | : | |
| JOHN VITILLO, ET AL. | : | |

**SURRICK, J.**                                                                                                    **JULY 19, 2005**

## MEMORANDUM & ORDER

Presently before the Court are Defendants John Vitillo, Vitillo Corporation, and Vitillo Engineering, Inc.'s ("Vitillo") Motion To Dismiss Indictment For Lack Of Jurisdiction And For Judgment Notwithstanding The Jury's Verdict (Doc. No. 95). For the following reasons, Defendants' Motion will be denied.

**I.      BACKGROUND**

On August 28, 2003, John Vitillo, Vitillo Corporation, and Vitillo Engineering, Inc., were indicted on three counts in violation of 18 U.S.C. § 666(a)(1)(A) for theft from a program receiving federal funds. (Doc. No. 1.) The Government filed a superseding indictment on May 18, 2004, which added a count against the Defendants for conspiracy in violation of 18 U.S.C. § 371. (Doc. No. 26.) On July 13, 2004, the Government filed a second superseding indictment ("Indictment") which contained the same conspiracy and theft counts as the prior superseding indictment plus facts related to sentencing.[1] (Doc. No. 36.) After a jury trial, each Defendant

---

[1]The second superseding indictment was in response to *Blakely v. Washington*, 124 S. Ct. 2531 (2004).

1

was found guilty on all charges.

On December 1, 2004, Defendants timely filed a motion for a new trial pursuant to Federal Rule of Criminal Procedure 33(a).  (Doc. No. 79.)  On April 29, 2005, we filed a Memorandum and Order denying that motion.  *United States v. Vitillo*, Crim. No. 03-555, 2005 U.S. Dist. LEXIS 7558 (E.D. Pa. Apr. 29, 2005).  On June 1, 2005, six months after the jury returned its verdict of guilty, Defendants filed the instant Motion to Dismiss the Indictment.  They argue that the Indictment should be dismissed because it does not allege a violation of 18 U.S.C. § 666(a)(1)(A).  (Doc. No. 95 at 1.)  Defendants assert that they could not have violated 18 U.S.C. § 666(a)(1)(A), even if the Government established each of the facts alleged in the Indictment, and that this Court therefore lacks jurisdiction.  *See id.* ("Because the Indictment fails to allege a federal offense, the district court lacks the subject matter jurisdiction necessary to try the Defendants for this crime."); *see also* Doc. No. 98 at 1 n.1 ("This motion is being brought to quash the indictment because the facts, even as alleged in the indictment, can not support the charge.").  Defendants do not seek a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29(c), nor do they challenge the Indictment as facially insufficient.  *See* Doc. No. 98 at 1 ("The Government misinterprets Defendants' Motion as a facial attack on the Indictment.  The attack, however, is on the appropriateness of the charge.").

**II.     LEGAL STANDARD**

Defendants indicate that their Motion arises under Federal Rule of Criminal Procedure 12(b)(3)(B), which provides in pertinent part that "at any time while the case is pending, the court may hear a claim that the indictment or information fails to invoke the court's jurisdiction or to state an offense."  Fed. R. Crim. P. 12(b)(3)(B); *see also United States v. Spinner*, 180 F.3d

514, 516 (3d Cir. 1999) (explaining that the "'failure of an indictment sufficiently to state an offense is a fundamental defect . . . and it can be raised at any time'" (quoting *United States v. Wander*, 601 F.2d 1251, 1259 (3d Cir. 1979)).[2]  Thus, Rule 12(b)(3)(B) permits a defendant to challenge an indictment at any time during the pendency of the proceedings.[3]  Rule 12(b)(3)(B)'s scope is similar to that of Federal Rule of Criminal Procedure 34, which allows a defendant to move to arrest judgment if an indictment does not charge an offense or if the court lacks jurisdiction over the charged offense.  Fed. R. Crim. P. 34.  In contrast to Rule 12(b)(3)(B), however, Rule 34 requires that a defendant "move to arrest judgment within 7 days after the court accepts a verdict or finding of guilty, or after a plea of guilty or nolo contendere, or within such further time as the court sets during the 7-day period."  Fed. R. Crim. P. 34; *see also* 1A Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure:  Criminal 3d § 193 at 334-35 (3d ed. 1999).[4]  Even though Defendants did not file a Rule 34 motion, the instant Motion may be considered by the Court pursuant to Rule 12(b)(3).[5]  *See United States v. Brown*,

---

[2] "The defense of failure to charge an offense may be based on the absence of an essential element in the indictment, indefiniteness of allegations, the lack of a statute creating a crime, or the unconstitutionality of the statute relied upon."  24 James Wm. Moore et al., Moore's Federal Practice § 612.04 (3d ed. 1999).

[3] Interestingly, Rule 12(b)(3) is titled "**Motions That Must Be Made Before Trial**."  Fed. R. Crim. P. 12(b)(3).

[4] This treatise interpreted Federal Rule of Criminal Procedure 12(b)(2), which was superseded by Rule 12(b)(3)(B).  "The textual differences between the two versions of the rule represent alterations in form only, and '[n]o change in practice [was] intended.'"  *United States v. Al Hedaithy*, 392 F.3d 580, 587 n.6 (3d Cir. 2004) (citing Fed. R. Crim. P. 12(b)(3)(B) advisory committee's note).

[5] We note that Rule 34 and Rule 12(b)(3)(B) both provide a mechanism for a defendant to file a motion seeking relief if the indictment does not charge an offense or if the court lacks jurisdiction over the offense charged.  However, such a motion under Rule 12(b)(3)(B) may be brought any time during the pendency of the proceedings.  Thus, the time limitation in Rule 34 is

154 F. Supp. 2d 1055, 1062 (E.D. Mich. 2001), *aff'd*, 332 F.3d 363 (6th Cir. 2003) (reviewing defendant's challenge to the sufficiency of the indictment even though he did not file a motion to arrest judgment under Rule 34).

While Defendants' Motion is properly filed under Rule 12(b)(3)(B), Defendants may not rely on facts which are extrinsic to the Indictment in arguing that the Indictment does not charge a violation of 18 U.S.C. § 666(a)(1)(A).  A court may only consider the four corners of an indictment to determine whether it states an offense.  *United States v. Panarella*, 277 F.3d 678, 685 (3d Cir. 2002) (interpreting Rule 12(b)(2), which was superseded by Rule 12(b)(3)(B)).  As the Third Circuit explained, an indictment does not state an offense if the specific facts it alleges "fall beyond the scope of the relevant criminal statute, as a matter of statutory interpretation."[6] *Id.; see also United States v. George*, 403 F.3d 470, 472 (7th Cir. 2005) (noting that Rule 12(b)(3)(B) does not permit a defendant to challenge the sufficiency of the evidence).  When a defendant waits until after trial to argue that the government failed to charge him with an offense, it is especially important to limit review to the indictment itself.  In such a situation, "the indictment will be 'upheld unless it is so defective that it does not, by any reasonable construction, charge an offense for which the defendant [was] convicted.'"  *United States v. Childress*, 58 F.3d 693, 720 (D.C. Cir. 1995) (quoting *United States v. Gironda*, 758 F.2d 1201, 1210 (7th Cir. 1985)); *see also Wander*, 601 F.2d at 1259 (explaining that "indictments which

---

essentially meaningless.

[6]We recognize that the *Panarella* defendant could not have relied on certain evidence, such as that introduced at trial, because he pled guilty.  However, Rule 12(b)(3)(B) "does not distinguish on its face between defendants who have pleaded guilty and those who have not." *Panarella*, 277 F.3d at 685.

4

are tardily challenged are liberally constructed in favor of validity" (internal quotation omitted)); *United States v. Freeman*, 813 F.2d 303, 304 (10th Cir. 1987) ("It is well established . . . that the failure of an indictment to state an offense is a fatal defect that may be raised at any time. Nonetheless, the countervailing interest in judicial efficiency requires that tardily-challenged indictments be construed liberally in favor of validity." (citing *United States v. Watkins*, 709 F.2d 475, 478 n.2 (7th Cir. 1983)); *United States v. Pheaster*, 544 F.2d 353, 361 (9th Cir. 1976). Such a limited review of an indictment is driven by the recognition that "the very limited resources of our judicial system require that such challenges be made at the earliest possible moment in order to avoid needless waste."[7] *Pheaster*, 544 F.2d at 361.

Defendants had several opportunities to argue that the evidence did not support the Indictment. As mentioned above, they filed a motion for new trial pursuant to Federal Rule of Criminal Procedure 33.[8] (Doc. No. 79.) Rule 33 provides that a district court may "'set aside

---

[7]Since Federal Rule of Criminal Procedure 34 may also apply to a defendant's claim that an indictment fails to charge an offense, it provides a useful analog for analyzing the instant Motion. "A Rule 34 motion must be based solely on a defect apparent on the face of the indictment itself, and not on the sufficiency of the evidence adduced at trial." *United States v. Diaz*, Crim. No. 92-78, 1993 U.S. Dist. LEXIS 3569, at *5 (E.D. Pa. Mar. 25, 1993), *aff'd*, 19 F.3d 644 (3d Cir. 1994) (table); *see also United States v. Kelly*, 548 F. Supp. 1130, 1132 (E.D. Pa. 1982). In *Kelly*, the court declined to consider whether the evidence was sufficient in the context of the defendant's motion to arrest judgment. *Kelly*, 548 F. Supp. at 1132. Rather, the sufficiency of the trial evidence was only relevant to defendant's motion for a new trial. *Id.* This case law further reinforces the conclusion that a court may not rely on facts that are not contained in an indictment in reviewing a challenge to it. Defendants do not point to any authority which would allow the Court to consider evidence which is not part of the indictment in reviewing the instant Rule 12(b)(3)(B) Motion, when it would be precluded from relying on such evidence to make the same inquiry as to the indictment under a timely-filed Rule 34 motion.

[8]Because Defendants' Motion did not rely on newly discovered evidence, they were required to file their Motion "within 7 days after the verdict or finding of guilty, or within such further time as the court sets during the 7-day period." Fed. R. Crim. P. 33.

the verdict and order a new trial if it ascertains that the verdict constitutes a miscarriage of justice'" such that there is a serious danger that an innocent person was convicted. *United States v. Broadus*, Crim. No. 04-61, 2004 U.S. Dist. LEXIS 22189, at *5-6 (E.D. Pa. Nov. 2, 2004) (quoting *United States v. Guadalupe*, Crim. No. 01-429-01, 2003 U.S. Dist. LEXIS 12263, at *1 (E.D. Pa. June 18, 2003)); *see also United States v. Rich*, 326 F. Supp. 2d 670, 673 (E.D. Pa. 2004). A court also "must grant a new trial if errors occurred during the trial, and it is reasonably possible that such error, or combination of errors, substantially influenced the jury's decision." *Rich*, 326 F. Supp. 2d at 673 (citing *United States v. Copple*, 24 F.3d 535, 547 n.17 (3d Cir. 1994)). In their Rule 33 Motion, Defendants argued that a new trial was necessary for the following reasons: (1) the Government engaged in prosecutorial vouching; (2) the Government pursued an improper line of inquiry while cross-examining Defendant Vitillo; and (3) the Government made improper reference to Defendant Vitillo's Fifth Amendment right not to testify during the Government's rebuttal of Vitillo's closing argument. The Defendants never argued that the guilty verdict was a miscarriage of justice because they were actually innocent of the offenses charged against them. *See Vitillo*, 2005 U.S. Dist. LEXIS 7558.

Defendants also could have filed a motion for a judgment of acquittal pursuant to Federal Rule of Criminal Procedure 29. Rule 29 allows a defendant "to question the sufficiency of the evidence to support a conviction." *United States v. Price*, Crim. No. 03-147, 2003 U.S. Dist. LEXIS 21071, at *2 (E.D. Pa. Nov. 19, 2003) (citing *United States v. Cohen*, 301 F.3d 152, 156 (3d Cir. 2002)). Under Rule 29(c), the Defendants were required to move for a judgment of acquittal "within 7 days after a guilty verdict or after the court discharges the jury, whichever is later, or within any other time the court sets during the 7-day period." Fed. R. Crim. P. 29(c). A

court may not grant an untimely motion for judgment of acquittal, "regardless of whether the motion is accompanied by a claim of legal innocence, is filed before sentencing, or was filed late because of attorney error." *Carlisle v. United States*, 517 U.S. 416, 420 (1996). Defendants offer no explanation for failing to file an appropriate motion for new trial or motion for judgment of acquittal.[9]

## III.  LEGAL ANALYSIS

### A.  Indictment Charge As To Asserted 18 U.S.C. § 666(a)(1)(A) Offense

To prove a violation of 18 U.S.C. § 666(a)(1)(A), the Government must show that: (1) Defendants were agents "of an organization, or of a State, local, or Indian tribal government, or any agency thereof"; (2) Defendants embezzled, stole, obtained by fraud, knowingly converted, or intentionally misapplied property that is "valued at $5,000 or more" from "such organization, government, or agency"; and (3) "such organization, government, or agency receives, in any one year period, [federal assistance] in excess of $10,000."[10] *United States v. Cornier-Ortiz*, 361

---

[9] Henry E. Hockeimer, Jr., Esq., and Rebecca Y. Starr, Esq., of the law firm of Hangley Aronchick Segal & Pudlin entered appearances on behalf of the Vitillo Defendants on June 1, 2005. (Doc. Nos. 93, 94.) That same day, Hangley Aronchick Segal & Pudlin filed the instant Rule 12(b)(3)(B) Motion on behalf of the Vitillo Defendants. However, Paul M. Yatron, Esq., of the law firm of Mogel Speidel Bobb & Kershner and Gerard P. Egan, Esq., of the law firm of Kenney Lennon & Egan, who served as counsel through trial, have not withdrawn their appearances.

[10] Section 666(a) provides in relevant part:

(a) Whoever, if the circumstance described in subsection (b) of this section exists–
    (1) being an agent of an organization, or of a State, local, or Indian tribal government, or any agency thereof–
        (A) embezzles, steals, obtains by fraud, or otherwise without authority knowingly converts to the use of any person other than the rightful owner or intentionally misapplies, property that–

7

F.3d 29, 33 (1st Cir. 2004) (quoting 18 U.S.C. § 666).

Counts Two, Three, and Four of the Indictment against the Defendants allege that in 1998, 1999, and 2000, Defendants

> John Vitillo, Vitillo Engineering, Inc., and Vitillo Corporation, <u>agents of the Reading Regional Airport Authority</u>, an organization which received benefits of over $10,000 in any one year period, that is [1998, 1999, and 2000], under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance or other form of federal assistance, embezzled, stole, and obtained by fraud, and aided, abetted, counseled, and procured the embezzlement, theft, and fraudulent obtaining of, property valued at $5,000 or more . . . which money was owned by and under the care, custody and control of the Reading Regional Airport Authority.

(Doc. No. 36 at 6, 7, 8 (emphasis added).)

### B. Agency Element of § 666(a)(1)(A) Offense

The Vitillo Defendants argue that § 666(a)(1)(A) cannot apply to them because they were not agents of the Reading Regional Airport Authority ("RRAA"). Defendants assert that they "were never granted any authority to act on behalf of the RRAA" and that they only performed work specified in their contract with the RRAA. (Doc. No. 95 at 4.) The Government responds that the Indictment alleged specifically that the Defendants were indeed agents as defined by §

---

(i) is valued at $5,000 or more, and
(ii) is owned by, or is under the care, custody, or control of such organization, government, or agency; . . .
shall be fined under this title, imprisoned not more than 10 years, or both.
(b) The circumstances referred to in subsection (a) of this section is that the organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance.
(c) This section does not apply to bona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business.

18 U.S.C. § 666(a) (2000).

8

666.

Section 666 defines the term agent as "a person authorized to act on behalf of another person or a government and, in the case of an organization or government, includes a servant or employee, and a partner, director, officer, manager, and representative."[11]  18 U.S.C. § 666(d). The critical agency inquiry under this statutory definition is whether a person is "authorized to act on behalf of another person or a government," irrespective of whether that person is an employee of the entity receiving federal funds.  The definition of agent includes "persons who act as directors, managers, or representatives of covered organizations, even if those persons are not actually employed by the organization[] . . . ." *United States v. Sotomayer-Vazquez*, 249 F.3d 1, 8 (1st Cir. 2001).  As the First Circuit explained in *Sotomayer-Vazquez*, "an outside consultant with significant managerial responsibility may pose a significant threat to the integrity of federal funds as a manager actually employed by the agency in question." *Id.*  In arriving at this conclusion, the court noted that "the inclusion of 'employee' in the statutory language as a separate qualification suggests that the definition of agent includes 'directors,' 'managers,' and 'representatives' who are not technically employees." *Id.*

Given the breadth of the statutory definition of agent, an independent contractor may certainly be considered an agent for the purposes of § 666.  *United States v. Toro*, No. 89 Cr. 0268, 1989 U.S. Dist. LEXIS 6449 (S.D.N.Y. June 8, 1989) (construing the definition of agent to include an independent contractor).  In *Toro*, the defendant recruited students for a computer school through her recruiting agency.  When the school retained Toro to recruit students, it

---

[11]In considering the scope of the agent definition, Congress expressly declined to incorporate the definitions of agency from the Restatement (Second) of Agency. *United States v. Toro*, No. 89 Cr. 0268, 1989 U.S. Dist. LEXIS 6449, at *3-4 (S.D.N.Y. June 8, 1989).

9

"enlisted her as its representative and authorized her to act on its behalf in that endeavor." *Id.* at *4. As a result, the court concluded that she was an agent of the school as defined by § 666. *Id.*

Defendant seeks to distinguish *Toro* from the instant case by arguing that Toro "was specifically hired to act on behalf of a school to perform a function normally exercised by the school, that is, to recruit students and was given the authority to do so, on behalf of the school." (Doc. No. 95 at 5.) However, the definition of agent is to be applied broadly. *Sotomayer-Vazquez*, 249 F.3d at 8. It is not limited to situations where an entity only confers authority on a person to perform a function that it would otherwise exercise itself.

The Indictment against the Defendants provides additional averments regarding their agency relationship with the RRAA. It alleges that:

> In or about October 1997, Vitillo Group, Inc. was appointed by the Authority as the primary engineer and principal engineer consultant for the Authority and the RRA. In or about April 1998, defendant VITILLO ENGINEERING, INC. assumed Vitillo Group, Inc.'s duties within the Authority and the RRA. Defendant VITILLO ENGINEERING, INC. submitted its bills for services to the Authority through defendant VITILLO CORPORATION. . . .
> On or about December 10, 1998, a contract was signed between the Authority and defendant JOHN VITILLO making defendant VITILLO ENGINEERING, INC. the construction manager of the RRA Expansion Project with compensation to paid [sic] to defendant VITILLO ENGINEERING, INC based upon the number of hours worked by its employees.

(Doc. No. 36 at 3.) These averments support the § 666(a)(1)(A) charge against the Defendants because they demonstrate that the Vitillo Defendants were "authorized to act on behalf of" the RRAA. We are satisfied that the specific facts alleged in the Indictment regarding the Defendants' agency relationship with the RRAA fall well within the scope of § 666(a)(1)(A).

In arguing that they were not agents of the RRAA, Defendants rely on evidence which is outside of the four corners of the Indictment, including language contained in the Engineering

10

Consulting Agreement ("Agreement") that was entered into between the RRAA and Vitillo Group, Inc. As discussed above, we do not believe that Federal Rule of Criminal Procedure 12(b)(3)(B) permits a wholesale review of the record to determine whether an indictment charges the defendant with an offense. However, if one makes a careful review of the record, one cannot fail to see that the record provides more than sufficient evidence that the Defendants were agents of the RRAA as defined by § 666.[12] The Agreement itself conferred broad authority on the Vitillo Group, Inc., stating that "VITILLO, as primary engineer and principal engineering consultant, shall coordinate and oversee all work and VITILLO shall have the overall responsibility for the acceptability and quality of all work performed." (Doc. No. 95 Ex. A at 1.) In performing in accordance with the contract, Defendants were obviously representatives, acting on behalf of the RRAA.[13] In addition, the expert report of Stephen E. Fournier, P.E., Defendants' expert, reinforces the fact that the Defendants received broad authority from the

---

[12]We refer to statements that are not included in the Indictment out of an abundance of caution in addressing Defendants' argument that their conduct could not have violated § 666, which argument finds its support beyond the Indictment.

[13]Defendants posit that "Defendants could not have been RRAA's agents if they were required by contract to indemnify RRAA and 'its agents'" (Doc. No. 95 at 5), relying on the following provision of the Agreement:

> To the fullest extent permitted by law, VITILLO shall indemnify and hold harmless RRAA and its agents and employees from and against all claims, damages and losses arising out of or resulting from the performance of VITILLO's services and duties provided that any such claim, damage or loss is caused solely by negligent acts, errors or omissions of VITILLO in the performance of professional services under this Agreement.

(Doc. No. 95 Ex. A at 2.) However, we note that we are required to apply the statutory definition of agent contained in § 666, rather than attempt to discern what the parties meant by the term "agent" as used in the Agreement.

RRAA. Fournier's report asserts that:

> As part of the construction management responsibilities, VITILLO and their design subcontractor BH/BA prepared bid documents, evaluated proposals from potential prime contractors, and provided recommendations to RRAA for award of the contracts. RRAA then awarded the following prime contracts for the Terminal Expansion Project.
> General Contractor - Gordon Baver, Inc.
> Kitchen Equipment - Singer Equipment Company
> Plumbing and Fire Protection - BNB Mechanical
> HVAC - Bohrer-Reagan (a subsidiary of Medlar Electric)
> Electrical - Medlar Electric
>
> It is important to note that these prime contractors had contracts with RRAA and not VITILLO. VITILLO was the construction manager and was responsible for assuring the Terminal Expansion Project work scope was performed in a quality manner and within the schedule proposed by RRAA.

(Fournier Expert Rep. at 3-4.) Thus, Defendants' own expert concluded that the Defendants were authorized to act on behalf of the RRAA regarding management of the expansion project, including oversight of contractors which had contracts with the RRAA.[14] The Defendants' relationship with the RRAA, as averred in the Indictment and as reflected by the record, clearly

---

[14]In fact, John Vitillo sent a letter to Singer Equipment Company, one of the prime contractors, memorializing a January 9, 2000, emergency meeting at the RRAA regarding "design and scheduling problems in the restaurant" at the airport. (Tr. Ex. D-56.) In that letter, Vitillo stated that:

> Both you and the Project Architect pledged full cooperation in expediting your work to meet the current construction schedule requiring the start of activities in the kitchen area by February 1, 2000 and completion within (5) weeks.
>
> In order to comply with this schedule, you have agreed to submit complete final shop drawings of improvements for the kitchen area, bar, storage area, receiving prep area, cooler, restaurant and snack bar by January 10, 2000. You also assured all in attendance that you will have your equipment delivered on-site by March 1, 2000, or earlier, in accordance with your earlier commitment.

(*Id.*) This letter is further evidence that the Vitillo Defendants indeed acted as agents of the RRAA regarding the airport expansion project.

12

demonstrates that they were agents of the RRAA as contemplated by § 666.

### C.    Benefits Element of 18 U.S.C. § 666(a)(1)(A) Offense

Defendants also argue that 18 U.S.C. § 666(a)(1)(A) cannot apply to them because they did not receive benefits as defined by the statute. Under § 666(b), the Government must show that an "organization, government, or agency receives, in any one year period, benefits in excess of $10,000 under a Federal program involving a grant, contract, subsidy, loan, guarantee, insurance, or other form of Federal assistance." 18 U.S.C. § 666(b). In the context of § 666, the term benefits is used to identify which entities are protected under the statute. If a person fraudulently obtains funds from an organization that does not receive statutory benefits, then § 666 is inapplicable. "[B]ona fide salary, wages, fees, or other compensation paid, or expenses paid or reimbursed, in the usual course of business" are exempted from the definition of benefits. *Id.* § 666(c); *see also Fischer v. United States*, 529 U.S. 667, 678-79 (2000) (applying § 666(c) exemption to § 666(b)).

Defendants rely on *United States v. Stewart*, 727 F. Supp. 1068 (N.D. Tex. 1989), and *United States v. Webb*, 691 F. Supp. 1164 (N.D. Ill. 1988), to support their argument that there can be no § 666 violation because no Defendant received statutory benefits. In *Stewart*, the government advanced the novel theory that § 666 liability could attach to theft from Bell Helicopter, a private government contractor. The government alleged that the defendants developed a plan to steal tools and helicopter parts from Bell Helicopter and asserted that § 666(b) was satisfied because the private contractor received requisite benefits in excess of

$10,000.[15] The district court applied the § 666(c) exemption to the term "benefits" in § 666(b) and concluded that "monies paid in consideration for goods provided, even if customized, are not benefits within the meaning of the statute." *Id.* at 1072. Thus, the court concluded that Bell Helicopter did not receive benefits as defined by § 666(b).

In *Webb*, the United States Department of Housing and Urban Development ("HUD") contracted with Hill Taylor, a private accounting firm, to manage and administer a Section 8 program, which provided rental and utility payment assistance to families with low and moderate incomes. *Webb*, 691 F. Supp. at 1165. Hill Taylor had access to the account in which HUD deposited the Section 8 funds and made payments from this account to individual landlords. During the course of this contract, various Hill Taylor employees embezzled funds from the Section 8 account. *Id.* In its motion for judgment notwithstanding the verdict on the § 666 count, defendant Webb argued that the statute was inapplicable because Hill Taylor did not receive benefits under a federal program. The government conceded that the funds that HUD paid to Hill Taylor to administer and manage the program were not § 666 benefits. *Id.* at 1169. Further, the court disagreed with the government's position that the funds in the Section 8 account were benefits under § 666. In determining that there could be no § 666 violation, the court explained

> that Hill Taylor was not the sort of organization which Congress intended to cover in enacting § 666. Not only does Hill Taylor not receive direct benefit from the federal funds which it administers, but it can hardly be said to "receive" anything

---

[15]The Indictment characterized Bell Helicopter "as a private organization that received benefits in excess of $10,000 in a one year period pursuant to a federal program involving contracts for the manufacture and modification of helicopters for the United States." *Stewart*, 727 F. Supp. at 1070. Because property valued at more than $5,000 was stolen, the government argued that § 666(a) was satisfied as well.

14

>at all. To be sure, Hill Taylor obtained access to the federal funds when HUD placed them in the [Section] 8 account, but Hill Taylor did not control how the federal funds would be distributed, and title to the funds remained with the United States until Hill Taylor had paid the funds over to the recipient-landlords.

*Id.* at 1169-70.

*Stewart* and *Webb* are easily distinguished from the instant case. In *Stewart*, the court concluded that Bell Helicopter did not receive benefits such that it was an entity that was protected from theft by § 666. Because Bell Helicopter was not a protected entity under the federal statute, theft from it was not proscribed by § 666. Similarly, the *Webb* court determined that the statute did not protect Hill Taylor because it received no direct federal benefits. Here, the Indictment avers that the RRAA, and not the Vitillo Defendants, received benefits in excess of $10,000 under § 666(b).[16] *See* Doc. No. 36 at 6, 7, 8 (asserting that the Vitillo Defendants were "agents of the Reading Regional Airport Authority, an organization which received benefits of over $10,000 in any one year period, that is [1998, 1999, and 2000], under a federal program involving a grant, contract, subsidy, loan, guarantee, insurance or other form of federal assistance"). The Government's theory was that § 666 protected the property of the RRAA. It was not required to prove that the Defendants received benefits under § 666(b).[17]

---

[16] Defendants concede that "[d]uring each of the years in question, the RRAA received more than $10,000 from the Federal Aviation Administration ('FAA') for improvement programs." (Doc. No. 95 at 2.)

[17] Defendants also rely on *United States v. Wyncoop*, 11 F.3d 119 (9th Cir. 1993), to support their argument that Vitillo did not receive benefits as defined by § 666. (Doc. No. 95 at 7.) In *Wyncoop*, the court dismissed the indictment because the government pointed to no organization that received federal benefits. *Id.* at 123. The *Wyncoop* defendant embezzled money from a college by diverting student loan deposits and then writing checks on that account to his girlfriend. *Id.* at 120. The defendant sought dismissal of the indictment because the college was not an organization that received benefits in excess of $10,000 each year. The court agreed, noting that the college only received indirect benefits from a federal program. *Wyncoop*

### D. Theft Element of 18 U.S.C. § 666(a)(1)(A) Offense

Even though the Government averred that the RRAA was an entity that was protected by § 666, it was still required to show that the Defendants embezzled, stole, obtained by fraud, knowingly converted, or intentionally misapplied property that is "valued at $5,000 or more" from the RRAA. 18 U.S.C. § 666(a). To the extent that Defendants seek to rely on the § 666(c) exemption to argue that the Vitillo Defendants could not be liable for theft from a government program, their argument fails.[18] The cases that have interpreted § 666(c) have consistently held that acts of fraud are not bona fide payments made in the usual course of business. In concluding that § 666(c) was not unconstitutionally vague, the Eleventh Circuit in *United States v. Edgar*, 304 F.3d 1320 (11th Cir. 2002), explained that

> any reasonable person would understand that the phrase "usual course of business" in § 666(c) would not bar prosecution for the conduct alleged in the § 666 counts in the Indictment. Among the transactions for which [defendant] was convicted were the following: converting hospital monies into unauthorized bonuses to himself; profiting from the Hospital's use of a warehouse that he, [his co-defendant], and another officer in effect sold to the Hospital on two separate occasions; participating in the diversion of Hospital funds to himself and others through the use of fictional invoices; collecting a finder's fee from the Hospital in connection with an investment of the Hospital's parent company; using Hospital monies to pay premiums on insurance policies for which he was solely responsible; and profiting from the Hospital's purchase, at an inflated price, of a real estate option from a partnership in which he held an undisclosed interest. Any reasonable person would understand that the funds involved in these transactions could not be construed as lawful payments or reimbursements made in the "usual course of business."

---

does not help these Defendants because the Indictment here alleges that the RRAA received sufficient *direct* benefits from a federal program to satisfy the benefits requirement of § 666(b). (Doc. No. 36 at 1-2.)

[18]The § 666(c) exemption applies to § 666(a) as well. *United States v. Mills*, 140 F.3d 630, 633 (6th Cir. 1998) (§ 666(c) "must be read to apply to all of § 666").

16

*Id.* at 1328; *see also United States v. Urlacher*, 979 F.2d 935, 938 (2d Cir. 1992) (holding that § 666(c) did not exempt from coverage the intentional misapplication of funds, even for legitimate purposes); *United States v. Abney*, Crim. No. 3-97-260, 1998 WL 246636, at *2 (N.D. Tex. Jan. 5, 1998) (holding that § 666(c) did not apply where defendants altered time sheets to receive payment for overtime hours that were never worked); *United States v. Stout*, Nos. Civ. A. 93-2289, Cr. 89-317, 1994 WL 90025, at *5 (E.D. Pa. Mar. 21, 1994) (holding that § 666(c) exception did not apply to defendant who had "created" ghost employees and sought reimbursement for their employment).

In this case, the Indictment charges the Defendants with engaging in a course of fraudulent conduct by intentionally submitting false invoices and billing records to the RRAA which overreported the number of hours actually worked on the airport expansion project. Specifically, it avers that the Defendants "created false invoices and billing records to fraudulently obtain money from the [Reading Regional Airport]," "falsely inflated the number of hours reportedly worked on projects at the [Reading Regional Airport] to fraudulently obtain money from the [Reading Regional Airport]," and then "created and submitted to the Authority inflated billings for work hours allegedly performed by VITILLO ENGINEERING, INC., and VITILLO CORPORATION employees and officers at [Reading Regional Airport] on projects including the Expansion Project." (Doc. No. 36 at 4-5.) As with the improper practices in *Edgar*, any reasonable person would understand that the funds involved in the payment of these fraudulent invoices and bills cannot be construed as lawful payments or reimbursements made in the "usual course of business."

### E.	Legislative Purpose of 18 U.S.C. § 666

Finally, a review of the statute's legislative purpose further reinforces our conclusion that the Indictment against the Vitillo Defendants properly alleges a violation of 18 U.S.C. § 666(a)(1)(A).  Section 666 "was 'designed to create new offenses to augment the ability of the United States to vindicate significant acts of theft, fraud, and bribery involving Federal monies which are disbursed to private organizations or State and local governments pursuant to a Federal program."  *United States v. Cicco*, 938 F.2d 441, 444 (3d Cir. 1991) (quoting S. Rep. No. 98-225 at 369, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510).  The statute was adopted "to redress particular deficiencies in identified existing statutes."  *Id.* at 445.  As the Third Circuit noted in *Cicco*, the statute's legislative history provides keen insight into the enforcement gap that existed prior to the adoption of § 666:

> 'With respect to theft, 18 U.S.C. 665 makes theft or embezzlement by an officer or employee of an agency receiving assistance under the Job Training Partnership Act a federal offense.  However, there is no statute of general applicability in this area, and thefts from other organizations or governments receiving Federal financial assistance can be prosecuted under the general theft of Federal property statute, 18 U.S.C. 641, only if it can be shown that the property stolen is property of the United States.  In many cases, such prosecution is impossible because title has passed to the recipient before the property is stolen, or the funds are so commingled that the Federal character of the funds cannot be shown.  This situation gives rise to a serious gap in the law, since even though title to the monies may have passed, the Federal Government clearly retains a strong interest in assuring the integrity of such program funds.'

*Id.* (quoting S. Rep. No. 98-225 at 369, *reprinted in* 1984 U.S.C.C.A.N. 3182, 3510).  Thus, the aim of the statute "was to protect federal funds by authorizing federal prosecution of thefts and embezzlement from programs receiving substantial federal support even if the property involved

no longer belonged to the federal government."[19]  *Id.*

Section 666 was intended to prohibit exactly the kind of conduct engaged in by the Defendants in this case.  Before the enactment of this provision, the Government would have been unable to pursue a violation under 18 U.S.C. § 665 because there was no "theft or embezzlement from employment and training funds."  Further, the Government would have had particular difficulty establishing that the funds which were improperly obtained from the RRAA constituted property of the United States under 18 U.S.C. § 641.  Under the terms of § 666, however, the Government was not required to show that the misappropriated funds were federal.  *United States v. Valentine*, 63 F.3d 459, 464 (6th Cir. 1995).  The adoption of § 666 augmented the ability of the United States to vindicate significant acts of theft and fraud, and in this instance, to prosecute Defendants in order to protect the financial interests of the RRAA.

An appropriate Order follows.

---

[19]The *Webb* court also recognized that § 666 was designed to target activity that had previously evaded 18 U.S.C. § 641.  *See Webb*, 691 F. Supp. at 1170 (quoting 1984 U.S.C.C.A.N. 3182, 3510).  It noted that prosecuting the defendant under § 666 would not effectuate the statute's purpose because the funds in the Section 8 account constituted federal property.  As a result, any theft of these funds violated § 641.  *Id.*

IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | |
| | : | |
| v. | : | CRIMINAL NO. 03-555 |
| | : | |
| | : | |
| JOHN VITILLO, ET AL. | : | |

**ORDER**

AND NOW, this 19th day of July, 2005, upon consideration of Defendants John Vitillo, Vitillo Corporation, and Vitillo Engineering, Inc.'s ("Vitillo") Motion To Dismiss Indictment For Lack Of Jurisdiction And For Judgment Notwithstanding The Jury's Verdict (Doc. No. 95, No. 03-CR-555), and all papers submitted in support thereof and in opposition thereto, it is ORDERED that Defendants' Motion To Dismiss Indictment For Lack Of Jurisdiction And For Judgment Notwithstanding The Jury's Verdict is DENIED.

IT IS SO ORDERED.

BY THE COURT:

_____
R. Barclay Surrick, Judge